IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ELECTA DENHAM, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 12-0195-WS-C |
| | ) |
| WAL-MART STORES EAST, LP, | ) |
| | ) |
|     Defendant. | ) |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 19). The Motion has been briefed and is ripe for disposition.

**I.    Nature of the Case.**

This is an action for employment discrimination and retaliation brought by a *pro se* plaintiff.[1] In her bare-bones Complaint, plaintiff, Electa Denham, alleged, "I have been discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended." (Doc. 1, at 2.) The pleading's sole elaboration on the facts underlying her claims is as follows: "Hours was reduce to part time causing a loss of benifits after reporting complaint after 10 yrs of full time status." (*Id.*) Plaintiff further explained her claims in the Report of Parties' Planning Meeting by stating that her race discrimination claim rests on an incident in which she "had overheard a racial slur used by a fellow associate," for which Denham felt management's response was inadequate. (Doc. 10, at 1.)

Construing the pleadings liberally in view of Denham's *pro se* status, and looking at the court file in its entirety, the Court agrees with defendant's assessment that Denham is bringing

---

[1] On February 7, 2013, after summary judgment briefing had closed, an attorney filed a Notice of Appearance (doc. 26) for plaintiff. Nonetheless, all of plaintiff's filings (including pleadings and summary judgment submission) were filed on a *pro se* basis, and will therefore be afforded lenience. *See, e.g., Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) ("we are to give liberal construction to the pleadings of *pro se* litigants").

two Title VII claims against Wal-Mart, one for race discrimination and one for retaliation. The discrimination claim alleges racial harassment, and the retaliation claim is predicated on Wal-Mart's purported reduction of Denham's hours following her complaint of race discrimination. Defendant now seeks summary judgment on both of these causes of action.

## II.     Relevant Facts.[2]

The underlying facts and circumstances of this case are straightforward. Electa Denham, an African-American female, is a long-time hourly employee at Wal-Mart Store #4333 in Fairhope, Alabama. (Smith Decl. (doc. 21, Exh. 2), ¶ 2.) At all times relevant to her Complaint, Denham worked as a grocery stocker, ostensibly on a full-time basis, although she subsequently transferred to the position of sales associate in the shoe department in 2012. (Denham Dep., at 20-21.) As of her October 2012 deposition, Denham remained employed at Wal-Mart Store #4333. That store, a Wal-Mart Super Center, is open 24 hours per day, 7 days per week, 364 days per year. (*Id.* at 44.)

### A.     The August 2009 Incident.

On the morning of August 9, 2009, Denham was at work at Wal-Mart when she went outside to procure a cart to load groceries for stocking purposes. (Denham Dep., at 73-74.) As she walked outside, Denham encountered a Wal-Mart employee named Sharon Widger (a white female who worked in a different area of the store whom Denham did not know and with whom she had never spoken) conversing with a female employee named Johnsie Wilson. (*Id.* at 72-75.) As Denham approached, she overheard Widger make a statement to Wilson about "niggers in the damn neighborhood." (*Id.* at 74-75.)

Moments later, Denham reported this offensive comment to department manager Schvante Johnson. (Denham Dep., at 75-76.) While Johnson was apprising Denham of her reporting options, the Store Manager, Kevin Smith, walked by. (*Id.* at 77.) Denham informed Smith what she had overheard and emphasized that "it was very offensive to me," in response to which Smith assured that he would "check into it." (*Id.*) Denham also promptly reported the incident to her zone manager at Wal-Mart. (*Id.*)

---

[2]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

Wal-Mart commenced an investigation into the incident on that very day. (Smith Decl., ¶ 4.) For her part, Widger admitted having used "the n-word," but the surrounding circumstances revealed that she was not directing it at Denham or anyone else at Wal-Mart, but was instead referring to a situation in her personal life. (*Id.*)[3] Smith and Wal-Mart took harsh disciplinary action against Widger, in the form of a "Decision-Making Day" (which is the final progressive discipline step before termination). (*Id.*) Wal-Mart specifically coached Widger not to "use any words that involve stereotyping of other associates," and cautioned her that "[t]he next level of action if behavior continues is … Termination." (Smith Decl., Exh. B.) For her part, Widger apologized and vowed not to use that word again. (*Id.*)

This initial resolution of her internal complaint did not mollify Denham, who made it clear that she felt Widger should be fired for using such a racial slur in the workplace, regardless of context and circumstances. (Smith Decl., ¶ 5.) So Denham voiced her dissatisfaction with what she perceived to be an inadequate Wal-Mart response by calling the company's toll-free hotline for employee concerns. (*Id.*, ¶ 6.) Denham explained the incident to Wal-Mart's hotline agent, and stated that she expected "zero tolerance" for use of the n-word in the workplace. (Denham Dep., at 113.) Denham's hotline complaint reiterated her desire that Widger be fired or transferred to another store. (*Id.* at 114, 123.) She spent approximately 30 or 35 minutes on the hotline discussing her complaint with a Wal-Mart corporate representative. (*Id.* at 117.) In response, Wal-Mart reopened its investigation, took additional witness statements, and reconsidered its conclusions. (*Id.*) Upon reconsideration, however, Wal-Mart upheld its original decision not to fire Widger, and so notified Denham. (Smith Decl., ¶ 6.)

Despite plaintiff's dissatisfaction with the disciplinary measures taken by Wal-Mart against the employee who uttered the racial slur, it is undisputed that Denham has never experienced any other incidents or comments at Wal-Mart that she considered to be racially

---

[3] In connection with that investigation, Widger submitted a written account of the incident, as follows: "I was speaking with another associate in the backroom talking about an experience with my husband in reference to my yard. I used the wrong word to describe how nasty + dirty my yard was. I am sorry an associate walked by and overheard our conversation. I will not use that word or any other steryotyping [*sic*] word again at Wal-mart. I really enjoy my job and am very sorry. The word used was nigger." (Smith Decl., Exh. C.) Widger's account was corroborated in all material respects both by Johnsie Wilson (the person with whom she was speaking) and by Denham herself. (*Id.*)

hostile or offensive. Indeed, Denham testified that she never spoke with Widger after this incident, and that when Widger would offer pleasantries like "good morning" to her, Denham would not respond, but would simply keep on walking. (Denham Dep., at 108-09.) Denham never, ever had any issue or problem with Widger after August 6, 2009. (*Id.* at 195-97.) Nor does the record contain any evidence that – either before or after the singular incident of August 6, 2009 – Denham ever experienced offensive, race-based mistreatment or overheard any racially-charged comments by anyone at Wal-Mart.

### B.   Scheduling Issues.

#### 1.   *Staggered Shifts and Employee Availability.*

Prior to August 2009, management at the Wal-Mart store in Fairhope had advised stocking associates of imminent changes to their shifts. (Smith Decl., ¶ 7.) Rather than stocking only during the overnight and morning shifts (as had been the store's custom), the new practice contemplated stocking throughout the day, resulting in a reduced concentration of available stocking hours during overnight and morning shifts. (*Id.*) This change to a system of "staggered shifts" was not unique to the Fairhope store, but was instead adopted throughout the Wal-Mart market. (*Id.*) As a consequence of this change, fewer morning shifts would be scheduled for stockers to work. (*Id.*, ¶ 9.)

Wal-Mart utilizes an automated scheduling system for setting employees' shifts. (*Id.*, ¶ 8.) That system takes into account certain variables, including the store's demand for particular classifications of employees in particular departments at particular times of day or times of year, as well as each employee's stated availability. (*Id.*) On the latter point, each Wal-Mart employee completes an "availability sheet" reflecting the hours and days on which he or she declares himself or herself available to work. Certain employees declare themselves to be available 24 hours a day, 7 days per week, while other employees elect to block off particular days of the week or times of day in which they do not wish to be scheduled to work. (*Id.*) An obvious and predictable by-product of this system of matching the store's staffing needs to the employees' availability is that "[t]he more 'open' an associate's availability, the more hours he or she can expect to be scheduled." (*Id.*)

As a matter of personal choice and for reasons not germane to this litigation,[4] Denham limited her work availability at Wal-Mart to day shifts on Wednesdays through Sundays, with no evening or overnight shifts and no Monday or Tuesday shifts. (Smith Decl., ¶ 9.) In so doing, Denham exercised her right as a Wal-Mart employee to make herself available to work only on specific designated days and times, and to "block off" certain times of day or days of the week that she did not wish to be scheduled to work. (Denham Dep., at 45.) These selections were not irrevocable; rather, Denham remained free to revise her availability designations whenever she wished. (*Id.* at 68.) In accordance with this scheduling system, Denham completed "availability sheets" at various times, showing which hours she was willing to work and which she was not. (*Id.* at 40.) In her most recent availability sheet, dated November 7, 2009, Denham listed her availability as being from 4:00 a.m. to 4 p.m. on Wednesday through Sunday, with no availability on Monday or Tuesday. (*Id.* at 40-41, 70 & Exh. 2.) From the time she began working at the Fairhope store through August 2009, Denham had consistently blocked off Monday and Tuesdays as days on which she was unavailable to work, and all nights as times of day when she was unavailable to work. (*Id.* at 42-43.)

As of approximately August 2009, Smith met with the store's grocery stockers (including Denham) and asked all stockers in the entire department to open up their availability for one night per week because of shifts in stocking schedules. (Denham Dep., at 131-33, 137-39.) Most of the stockers agreed to do so; however, Denham informed Smith that she could not. (*Id.* at 134.) Within a short time, much (but certainly not all) of the stocking was being done during overnight shifts. (*Id.* at 135-36.)

### 2.    *Reduction in Plaintiff's Work Hours in September 2009.*

Denham's work hours declined almost immediately after she complained about the "n-word" incident. Prior to that time, she had regularly been receiving 38-40 work hours per week. (Denham Dep., at 142.) As of September 2009, however, her work hours dropped precipitously

---

[4] In her deposition, Denham explained that she did not want to be scheduled for work on Mondays and Tuesdays because she wanted to keep those days clear for doctor's appointments for herself and her mother, and because she wanted her days off to be back-to-back. (Denham Dep., at 43.) Denham also indicated that she needed to keep her nights free because she performs paid babysitting services for family members in the evenings on a regular basis. (*Id.* at 69-70, 160-61.)

to barely one shift per week.  (*Id.* at 142-43.)  For each two-week pay period, Denham was getting paid for just 18 hours.  (*Id.* at 158.)  Such meager scheduled hours stood in stark contrast to the full-time schedule she had consistently worked throughout her years of employment at Wal-Mart before she complained of race discrimination.

When Denham expressed concern to manager Bobbie Smith about this sudden decline, Smith recommended that Denham open her availability to 7 p.m. to get more hours.  (*Id.* at 138-39.)  Denham initially acquiesced to management's suggestion, by completing a new availability sheet in September 2009 that showed availability from 3:00 a.m. to 7:00 p.m. on Wednesday through Sunday.  Opening up her availability was for naught, however, as Denham's work hours did not improve, and she was not assigned any more hours.  (*Id.* at 139-40.)  She was still getting just one or two shifts per week, even after expanding her availability as Smith had advised her to do.  (*Id.* at 140, 158.)  Because opening up her availability had translated into no more working hours, but had instead resulted in her receiving the same meager weekly hours on a less desirable shift, Denham changed her availability back to 4:00 a.m. to 4:00 p.m. in November 2009.  (*Id.* at 140-41.)[5]  Denham's hours remained low until Kevin Smith left the Fairhope store, at which time her hours immediately shot upwards to 24, 28, or even 32 to 36 hours per week, all with Denham maintaining the same 4:00 a.m. to 4:00 p.m. availability on Wednesdays through Sundays.  (*Id.* at 141-42, 168.)

According to Denham, her shift assignments differed substantially from those of other stockers after the n-word incident.  For example, Denham identifies another stocker, Marion Gravely, who continued receiving regular 7:00 a.m. to 4:00 p.m. shifts in the grocery department after the change to staggered shifts.  (Denham Dep., at 156-58.)  This was so, despite the fact that Gravely's availability sheet effective as of December 2009 listed her availability as 4:00 a.m. to 6:00 p.m. (*i.e.*, similar to the 3:00 a.m. to 7:00 p.m. availability that Denham had specified in the September 2009 – November 2009 period).  (Denham Dep., at Exh. 11.)  Moreover, on Black

---

[5]  Denham's testimony is that when she changed her availability from the 3:00 a.m. to 7:00 p.m. range (16 hours per day) back to the 4:00 a.m. to 4:00 p.m. range (12 hours per day), she suffered no reduction in her hours.  (*Id.* at 141.)  Thus, Denham's experience during late 2009 was that neither opening up her availability nor constricting her availability had a meaningful, or even measurable, impact on the number of hours Wal-Mart scheduled her to work each week.

Friday in November 2009, Wal-Mart asked Denham to work extra hours only after all other stockers were already scheduled or had been asked to take those hours. (Denham Aff. (doc. 23-1), at 2.) During the Thanksgiving and Christmas holidays, Wal-Mart hired temporary workers to work the very 7:00 a.m. – 4:00 p.m. shift that Denham sought and was available to work, and gave her fellow stockers overtime hours to work those shifts, all the while giving just 8-10 hours per week to Denham herself. (*Id.* at 3.) More generally, plaintiff's evidence is that within a month after the staggered stocking shifts went into effect at the Fairhope store, all stockers were continuing to work full time, with the sole exception of Denham, who had been reduced to approximately one shift per week. (*Id.*) Plaintiff's evidence shows that Wal-Mart accommodated every other stocker's preferences for availability and shifts, but not hers. (*Id.*)

Denham was not silent about the scheduling problem when it occurred. To the contrary, Denham made her desire for more work hours known to store management immediately and repeatedly after the September 2009 staggered shifts went into effect; however, managers responded by telling her, "You know we're not going to give you no hours." (Denham Dep., at 127, 165-66.) When she asked about getting hours in another department, Wal-Mart management flatly told her "[t]here's no other hours in no other department." (*Id.* at 128.) Yet when a position came open in the back (which Denham described as a "backroom bending" position) for which Denham was trained and qualified, and which called for full-time hours from 7:00 a.m. to 4:00 p.m. (*i.e.*, within Denham's availability), Wal-Mart offered the position to at least three other stockers, but not to her. (Denham Aff., at 2.) This is so even though Wal-Mart also moved another stocker to a 7:00 a.m. – 4:00 p.m. soft lines staffer job to accommodate her preferences not to work nights. (*Id.*) Again, plaintiff's evidence is that no such courtesy was extended to Denham.

### III. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make

'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**IV.    Analysis.**

As noted, Denham has asserted Title VII claims against Wal-Mart for racially hostile work environment and for retaliation. Defendant now moves for summary judgment on both causes of action.

###    *A.    Racially Hostile Work Environment.*

Hostile work environment claims are analyzed under the same standards of proof and the same framework as other Title VII cases. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). To establish a claim of hostile work environment, Denham must show "(1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee …; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (citation omitted); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (similar). As Wal-Mart correctly points out in its summary judgment briefing, the fourth element is of dispositive importance here.

In evaluating whether a hostile work environment is sufficiently pervasive or severe to be actionable, courts look to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann*, 526 F.3d at 1378 (citations omitted); *see also Jones*, 683 F.3d at 1302 (in considering totality of circumstances for hostile work environment, courts must keep in mind that the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed") (citation omitted).

Here, Denham's filings are clear that she predicates her Title VII claim for a racially hostile work environment on a single incident in August 2009, in which she overheard a co-worker use the term "nigger" in referring to a personal matter.[6] Use of the n-word by any employee in a modern American workplace is as deplorable and despicable as it is patently offensive. However, such an isolated utterance on a single occasion by a co-worker, not directed at plaintiff or anyone else in the workplace, simply does not meet the legal threshold for a cognizable Title VII hostile work environment claim. *See, e.g., Brooks v. Hyundai Motor Mfg. Ala., LLC*, 2011 WL 4991612, *1 (11th Cir. Oct. 20, 2011) (summarily rejecting hostile work environment claim where plaintiff's team leader on several occasions used terms "you black folks" or "nigger," but such "racial slurs were very few in number, and plaintiff testified that they did not adversely affect her job performance").[7]

---

[6] Denham's Affidavit leaves no doubt that this is the sole factual basis of her race discrimination claim. In that document, she averred, "I believe that I was subjected to a racially hostile environment at Wal-Mart when I overheard a fellow Wal-Mart employee say the N word in my presence … while I was walking by." (Denham Aff., at 1.)

[7] *See also Barrow v. Georgia Pacific Corp.*, 2005 WL 1926420, *3 (11th Cir. Aug. 12, 2005) (evidence that supervisors and co-workers occasionally used terms like "nigger," "boy," and "black ass" towards plaintiff is not sufficiently severe or pervasive to alter conditions of employment); *Frazier v. Sabine River Authority Louisiana*, 2013 WL 363121, *4 (5th Cir. Jan. 30, 2013) (co-worker's use of word "nigger" in plaintiff's presence was "isolated and not severe or pervasive enough to support a hostile work environment claim"); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (finding evidence did not support objectively hostile work environment claim where there was a single incident in which a co-worker used the term "nigger" in plaintiff's presence); *Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054, *19-20 (S.D. Ala. Apr. 11, 2011) (bathroom graffiti, which included use of the term "nigger,"
(Continued)

The August 6, 2009 offensive utterance by a co-worker on Wal-Mart's premises, and overheard by Denham, was a stray remark that was not sufficiently severe or pervasive to alter the terms and conditions of Denham's employment or to create a discriminatorily abusive work environment. This evidence is inadequate to support a claim for hostile work environment, as a matter of law. Because plaintiff has not shown that her workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, Wal-Mart's Motion for Summary Judgment will be **granted** insofar as it relates to plaintiff's Title VII claim for a racially hostile work environment.

B.  *Retaliation.*

Plaintiff also asserts a claim of retaliation under Title VII, alleging that Wal-Mart retaliated against her by reducing her work hours from 38-40 per week to 8-10 per week shortly after she reported the n-word incident to store management and complained via the company hotline. In Denham's words, her claim is that "Wal-Mart intentionally reduced [her] hours to get rid of [her] or try and force [her] to quit as retaliation for [her] filing a racial discrimination complaint." (Denham Aff., at 3.)

To establish a *prima facie* case of retaliation under Title VII, Denham must show that "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (citation omitted); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted). If the employer articulates a legitimate reason for the challenged action, then the

---

"amounted to mere offensive utterances, not severe or threatening comments directed at [plaintiff] personally," and therefore did not give rise to a racially hostile work environment); *McCarty v. Marple Tp. Ambulance Corps*, 869 F. Supp.2d 638, 653 (E.D. Pa. 2012) (isolated incident in which co-worker used term "nigger" in conversation with plaintiff was not sufficiently severe or pervasive to support Title VII hostile work environment claim); *Davis v. Joseph J. Magnolia, Inc.*, 815 F. Supp.2d 270, 280-81 (D.D.C. 2011) (granting defendant's motion or summary judgment on hostile work environment claim where plaintiff alleged that supervisor referred to him as a "nigger" on a single occasion).

plaintiff must "show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *McCann*, 526 F.3d at 1375 (citation omitted); *see also Hill v. Wal-Mart Stores, Inc.*, 2013 WL 646376, *2 (11th Cir. Feb. 22, 2013) ("If a plaintiff-employee makes out a *prima facie* case of retaliation, and the employer articulates a legitimate, non-discriminatory reason for the action, the plaintiff must show, by a preponderance of the evidence, that the employer's reason is pretextual.").

With regard to a *prima facie* case, Wal-Mart correctly concedes that Denham engaged in protected conduct under Title VII when she complained to store management about a co-worker's racial slur and made a follow-up complaint on the Wal-Mart hotline. Defendant also admits "[f]or purposes of argument only" that the ensuing reduction in Denham's hours qualifies as a materially adverse action under the applicable standard for Title VII retaliation claims. (Doc. 20, at 8.)[8] Nonetheless, Wal-Mart insists that Denham cannot meet the third prong of her *prima facie* burden because "she cannot demonstrate … a causal relationship between her protected conduct and any adverse action." (*Id.*) The Court disagrees. Plaintiff's evidence is that the materially adverse action (*i.e.*, the reduction in work hours) began almost immediately

---

[8] Defendant's caveat that it is so stipulating solely for purposes of argument is misplaced. Applicable law leaves no doubt that a sudden reduction in assigned work hours from 38-40 per week to 8-10 per week qualifies as a materially adverse action in the retaliation context. For purposes of a Title VII retaliation claim, "[a]n action is materially adverse if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1259 (11th Cir. 2012) (citation and internal quotation marks omitted). By any coherent reckoning, the prospect of having one's work hours slashed by more than two-thirds (with resulting diminution in pay and benefits) might be expected to dissuade a reasonable worker from complaining of discrimination. Federal courts have routinely deemed similar harms to satisfy this modest threshold. *See, e.g., Equal Employment Opportunity Com'n v. Swissport Fueling, Inc.*, --- F. Supp.2d ----, 2013 WL 68620, *17 (D. Ariz. Jan. 7, 2013) ("A reduction in hours constitutes an adverse employment action."); *Sharpe v. Global Security Int'l*, 766 F. Supp.2d 1272, 1293 (S.D. Ala. 2011) (employee's transfer to a different department, accompanied by substantial loss of prestige and responsibility, and substantial increase in physical demands, satisfies *prima facie* element of materially adverse action); *Woods*, 2011 WL 1380054, at *26 ("Plainly, a reasonable fact finder could determine that the prospect of being assigned 'crap work' that was demeaning, filthy and physically unpleasant well might have dissuaded a reasonable worker from engaging in statutorily protected activity."). On this record, the Court concludes that Denham has shown a materially adverse action sufficient to establish that prong of a *prima facie* case of retaliation under Title VII.

after her protected activity (*i.e.*, the internal complaints of race discrimination), both of which events occurred in August 2009. Such close temporal proximity is, by itself, sufficient to discharge Denham's burden at the *prima facie* stage. *See, e.g., Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."); *Gross-Jones v. Mercy Medical*, 874 F. Supp.2d 1319, 1340 (S.D. Ala. 2012) ("the Eleventh Circuit has considered 52 days to be sufficient temporal proximity to satisfy the causation element of the *prima facie* case"). Accordingly, the Court finds that Denham has made a *prima facie* showing of retaliation, such that the burden of production shifts to Wal-Mart to articulate a legitimate, non-retaliatory reason for the reduction in plaintiff's work hours, so soon on the heels of her internal complaints of race discrimination.

Without question, defendant has satisfied its light burden of coming forward with a non-retaliatory reason for the challenged personnel action. Wal-Mart explains the reduction in Denham's hours beginning in August 2009 via the following sequence of circumstances: (i) a previously announced change in scheduling occurred, such that stocking work was performed on a staggered basis around the clock rather than solely in the mornings and overnights; (ii) a consequence of that modification was that fewer morning stocking shifts existed; (iii) Denham confined her availability to the mornings and afternoons; and (iv) the automated Wal-Mart scheduling system therefore assigned her fewer hours. (Smith Decl., ¶¶ 7-9.) Given such a showing by defendant, Denham can withstand the Motion for Summary Judgment only by demonstrating that this stated reason is pretextual. *See Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.").

To show that an employer's stated reason is pretext for unlawful retaliation, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to

disbelieve the reasons."). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. … Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088; *see also Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (plaintiff may satisfy burden of showing pretext "by showing that [defendant's] proffered reasons are not credible").

      Upon careful review of the record and the parties' respective arguments, the Court finds that Denham has cast sufficient doubt on Wal-Mart's stated explanation for reducing her work hours that a reasonable factfinder could deem it unworthy of credence. A host of considerations inform this determination. First, although defendant says the staggered scheduling change occurred across the board, plaintiff's evidence is that all other full-time stockers at the Fairhope store continued to receive full-time hours after the change, while her hours were slashed to one shift per week. Second, defendant's explanation that Denham's limited availability accounted for her differential scheduling treatment is suspect because even when Denham increased her availability to a window of 3:00 a.m. to 7:00 p.m. (at management's behest), she was assigned no additional hours. Rather, Denham testified that regardless of whether she expanded or contracted her availability, she continued to receive the same meager number of scheduled hours each week. Third, plaintiff's evidence is that at least one other stocking employee (Marion Gravely) continued to receive regular 7:00 a.m. to 4:00 p.m. shift assignments after the scheduling change, even though Gravely's availability was similar to (and, on many days, less than) plaintiff's. Fourth, plaintiff shows that when 7:00 a.m. – 4:00 p.m. stocking shifts were available during peak times, Wal-Mart would fill those slots with temporary workers and assign other full-time stockers to those shifts (paying them overtime compensation) rather than give them to Denham, who was available to work. Fifth, plaintiff's evidence is that Wal-Mart selectively offered transfers and other accommodations to every stocker except Denham to work with his or her stated availability and shift preferences. Sixth, plaintiff shows that Wal-Mart offered a transfer to all other stockers to a backroom bending department with regular shifts of 7:00 a.m. to 4:00 p.m., but refused to offer the position to Denham, even though defendant knew she was qualified and trained for the job and also knew how desperately she desired more working hours. Seventh, plaintiff casts further doubt on defendant's scheduling / availability explanation by showing that her weekly hours increased to 30+ as soon as the alleged retaliator

(Kevin Smith) left the Fairhope store, even though neither the scheduling parameters nor Denham's availability had changed.

Viewing the summary judgment record in the light most favorable to Denham, a reasonable factfinder could determine that Wal-Mart's stated explanation for the reduction in plaintiff's hours is plagued by inconsistencies and weaknesses that render it unworthy of credence. The staggered shifts detrimentally affected Denham alone, while other full-time stockers continued working full time. Plaintiff's availability limitations for scheduling purposes did not seem to matter, because (a) her hours did not increase even when she substantially opened up her availability at management's suggestion, and (b) at least one other stocker with comparable availability constraints continued to receive full-time assignments, while Denham did not. Wal-Mart accommodated other stockers' preferences to allow them to keep working full-time, but not Denham's, even to the point of offering a backroom bending position to every stocker other than Denham. Part-time workers and full-time stockers on overtime were assigned shifts that Denham was available to work. And, perhaps most tellingly, Denham's scheduled hours rebounded sharply once the alleged retaliator left the Fairhope store, without any modification in either Denham's availability or the staggered shift system. This evidence readily supports an inference of pretext and (when combined with the timing of the reduction in plaintiff's work hours) an inference that the real reason for the adverse action was unlawful retaliation for Denham's protected activity.[9]

---

[9] In its reply brief, Wal-Mart does not confront the vast majority of these concerns, but instead urges the Court to reject Denham's Affidavit as speculative. To be sure, there are spots in the Affidavit in which plaintiff couches her allegations in terms of what she "believes" or "feels." It is also true that a plaintiff's mere opinion that she felt the employer discriminated against her does not suffice on summary judgment. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) ("While Holifield has testified that he felt discriminated against, his opinion, without more, is not enough to establish a *prima facie* case of race discrimination."). But the factual averments recited above are couched as facts, not as statements of speculation, belief or opinion; therefore, they must and shall be credited on summary judgment. With respect to the "backroom bending" position, Wal-Mart counters that this job was not listed in Denham's "career preferences" and that "she never told management she wanted to be considered." (Doc. 25, at 3.) Recall, however, that plaintiff's evidence is that she had been trained and qualified for that job, and that Wal-Mart offered the job to at least three different stockers. Defendant does not explain why it passed over Denham. There is no evidence, for example, that the stockers to whom Wal-Mart offered the job listed the backroom position in their "career preferences." Nor could those stockers logically have told Wal-Mart they wanted to be considered for the position,
(Continued)

Because plaintiff has successfully rebutted Wal-Mart's asserted legitimate non-retaliatory reason for the reduction in her hours, the Court finds that genuine issues of material fact remain as to whether Wal-Mart violated the anti-retaliation provisions of Title VII by cutting Denham's work hours drastically within weeks after she complained of race discrimination. Defendant will not be granted summary judgment on this cause of action.

## V.   Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant's Motion for Summary Judgment (doc. 19) is **granted in part**, and **denied in part**. The Motion is **granted** with respect to plaintiff's Title VII claim of a racially hostile work environment, and that claim is **dismissed with prejudice**. The Motion is **denied** with respect to plaintiff's Title VII claim of retaliation;

2. This matter remains set for a Final Pretrial Conference before the undersigned on **April 9, 2013 at 1:30 p.m.**, with non-jury trial to follow in **May 2013**. If plaintiff is not represented by counsel, she is reminded that she must personally attend the Final Pretrial Conference, and must work with defendant's counsel to prepare and submit a joint pretrial document in accordance with this Court's Standing Order Governing Final Pretrial Conference (doc. 15-1); and

3. The court file reflects that, to date, the lawyer who filed a Notice of Appearance on plaintiff's behalf has failed to follow the Clerk's instructions to submit the necessary paperwork to be admitted to practice in this Court. (*See* doc. 29.) Until/unless this deficiency is corrected, the Court will not accept filings from this attorney, and this attorney cannot represent plaintiff in these proceedings.

---

given plaintiff's evidence that all of them <u>declined</u> the job when it was offered. So defendant's explanation on the "backroom bending" job offer is wanting in multiple respects. As for the other aspects of plaintiff's pretext argument (*i.e.*, the lack of any tangible change in hours when plaintiff opened up her availability, the differential treatment of employees like Gravely, the assignment of shifts to temporary workers and regular workers on overtime even when Denham was available for those shifts, the accommodation of every stocker's preferences but Denham's, and the miraculous increase in plaintiff's work hours as soon as Smith left the store), defendant does not even attempt to address or explain them.

Accordingly, the Court continues to regard the plaintiff as *pro se*, and **directs** the Clerk of Court to mail a copy of this Order to plaintiff directly at her mailing address of record.

DONE and ORDERED this 26th day of March, 2013.

                                        s/ WILLIAM H. STEELE
                                        CHIEF UNITED STATES DISTRICT JUDGE